United States Court of Appeals,

Fifth Circuit.

No. 96-21001.

David ASKANASE, Trustee;  Fitness Corporation of America, Plaintiffs-Appellants,

v.

Tom J. FATJO, et al., Defendants,

Tom J. Fatjo, Jr.;  C.A.J.A. Enterprises, Inc.;  Bayou Park Club Partnership, A Texas General Partnership;  Criterion Research, Inc.;  Elstead Investment Co., A Texas General Partnership;  Ron Hemelgarn;  Air 500 Ltd.;  Beechmont Partnership;  Coordinated Spa Services, Inc.;  Deluxe Office Products;  Fitness Research International;  Great Lakes Leasing Agency;  H & C International;  Hemelgarn Racing, Inc.;  Management Computer;  Newtowne Enterprises, Inc.;  Quad Cities Ltd.;  Spa One Advertising;  Spa Computer;  Spa Janatorial;  Spa Lady, Inc.;  Spa Printing;  Twenty-First Century;  WHM Enterprises;  Watson Melby Hemelgarn Partnership;  Westchester Spa Partnership;  Ernst & Young, formerly known as Ernst & Whinney;  Housprops, Inc., A Texas Corporation;  Houstonian Holdings Partnership, A Texas Partnership;  Peter M. Jackson;  Ahmed Mannai;  Fitness Investment N V, A Netherlands Antilles Corporation;  Fitness Investment (Texas), Inc., A Texas Corporation;  Houstonian Estates Investment Co. N V, A Netherlands Antilles Corporation;  Mannai Investment Company, Inc., C, A Delaware Corporation;  Xantor, Inc., A Panamanian Corporation;  Parkgate Associated Ltd.;  Parkgate, Inc., A Corporation;  Roger A. Ramsey;  John Snideman, doing business as Financial Services Corporation;  John Snideman, doing business as Management Accounting, Inc.;  Gerald M. H. Stein;  Joseph J. Zilber;  JZL Ltd., A Nevada Corporation;  ZL Company, Inc., A Delaware Corporation;  Zilber, Inc.;  Zilber Ltd., A Nevada Corporation;  Financial Services Corporation;  Management Accounting, Inc.;  Hfund, Inc.;  Corporate Communications Center, Defendants-Appellees.

In the Matter of: LIVINGWELL, INC., Debtor.

David ASKANASE, Trustee, Appellant,

v.

Tom J. FATJO, Jr., Appellee.

In the Matter of: LIVINGWELL (NORTH), INC.; LivingWell (Midwest), Inc., Debtors.

1

David ASKANASE, Appellant,

v.

M W B LEASING, INC., Appellee.

In the Matter of: LIVINGWELL (MIDWEST), INC.; LivingWell, Inc., Debtors.

David J. ASKANASE, Appellant,

v.

TOWNE REALTY, INC.; Joseph J. Zilber, Appellees.

In the Matter of: LIVINGWELL, INC., Debtor.

David J. ASKANASE, Appellant,

v.

ZILBER LTD.; Joseph J. Zilber, Appellees.

Dec. 23, 1997.

Appeal from the United States District Court for the Southern District of Texas.

Before GARWOOD, DUHÉ and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

Appellant, the Bankruptcy Trustee of LivingWell, Inc. and related companies, appeals from a take nothing judgment in favor of the Defendants, Ernst & Young, LivingWell's auditors, and Tom Fatjo et al., who are either former directors, officers, or shareholders of LivingWell, Inc. or separate businesses owned by these officers, directors, or shareholders. The fifteen issues asserted on appeal basically involve five claims. First, the Trustee argues that he may recover money LivingWell paid its subsidiaries, officers and directors, and their related businesses. He does so under the trust fund doctrine, which prohibits an insolvent corporation from

paying money or distributing assets to its directors in preference to creditors. Second, the Trustee sues the directors alleging misconduct and breach of the duty of loyalty and care and their fiduciary duty. Third, the Trustee claims that the directors fraudulently caused LivingWell to transfer money and assets to themselves and unlawfully redeemed LivingWell stock. Fourth, the Trustee sues the majority shareholder, Ahmed Mannai, for damages on the basis that Mannai controlled the board of directors through his two agents and is therefore responsible as a director. Last, the Trustee sues Ernst & Young, who audited LivingWell, for breach of contract, negligence, gross negligence, fraud, and fraud based conspiracy. We affirm.

I

In October of 1983, three Texas limited partnerships, the Houstonian Properties, Ltd.("HPLtd"), the Houstonian Estates, Ltd.,("HELtd") and LivingWell, Ltd., and one Texas general partnership, Houstonian General Partnership ("HGP") combined to form the Houstonian, Inc., a Texas Corporation. The Houstonian's major assets were: the Houstonian Properties Hotel, Conference Center, and Club, the Manor and Ambassador Houses, twenty-nine condominium units in the Houstonian Estates Condominiums, a 4.8 acre parcel of land adjacent to the Club and Condominium, the Houstonian Preventive Medicine Center and its exclusive rights to market, develop, and sell the LivingWell Programs and related operating assets. In exchange for these assets HPLtd received Houstonian Inc. common stock; HGP received common stock which it

3

distributed to HELtd; LivingWell received common stock. In 1985, the Houstonian was merged into LivingWell.[1]

In 1984, LivingWell purchased 82 fitness clubs in the southeastern United States for over $10 million cash, shares of its common stock, and an agreement that, if, over the next five years, the clubs achieved certain earnings goals, then the sellers would receive additional consideration up to $10 million (50% in cash and 50% in value of common stock). Ron Hemelgarn, one of the principal shareholders of the seller, became a LivingWell director.

In March of 1985, LivingWell acquired over 200 fitness facilities nationwide for $15.5 million cash, 1,774,750 shares of LivingWell common stock and 68,572 shares of LivingWell's Series C Convertible Preferred Stock. As an additional part of the transaction, LivingWell could issue up to 750,000 shares of common stock over the next five years if one of the acquired groups reached specified earnings levels.

On March 29, 1985, Zibler, Ltd., purchased 50,000 shares of LivingWell's Series D Convertible Preferred Stock for $5 million. Zibler, Ltd., loaned an additional $10 million to LivingWell and Zibler had the option to acquire warrants to purchase 3,233,790 shares of common stock at prices of $4 to $8 per share.

A. Source of Capital

In September of 1985, LivingWell sold $16.1 million of 12% convertible, subordinated debentures. Net proceeds were used to

---

[1]"LivingWell" will refer to the Houstonian both before and after the merger.

pay existing debt and increase capital. Through 1985 and into 1986, LivingWell successfully converted preferred stock into common stock thereby raising additional funds in the public markets. In May 1986, LivingWell sold $52 million of subordinated debentures and warrants. Of the nearly $51 million in net proceeds, $40.15 million was used to retire outstanding debts.

B. Relevant Transactions

1. PAC

In June 1986, LivingWell and certain of its individual shareholders created a separate financing company, Paramount Acceptance Corporation ("PAC"), a Delaware corporation, to collect LivingWell's receivables. PAC had its own officers and directors. Prior to PAC's creation, LivingWell collected its receivables (club and membership fees and dues) through its regional subsidiaries (LW North, LW South, and LW Midwest).

2. Sale of Clubs

During 1986, LivingWell sold 41 clubs to Powercise, Inc., a corporation formed by some LivingWell employees. Shortly thereafter, T.H.E. Fitness Centers, Inc., an outside group, acquired other of LivingWell's small clubs. As part of the deal, T.H.E. received rights to the Powercise technology owned by LivingWell and LivingWell received equivalent stock in T.H.E.

3. Hfund Transaction

When the Houstonian Hotel and Conference Center experienced financial difficulty that threatened foreclosure, a new entity, called Hfund, Inc., was created. LivingWell exchanged its interest

in the Houstonian fitness operations for preferred stock in the newly formed Hfund, Inc., a Delaware corporation. Pursuant to the exchange, additional cash was made available to the mortgage holder thereby avoiding foreclosure.

4. Bankruptcy Filing

When the prospect of bankruptcy became apparent LivingWell attempted to restructure its organization. LivingWell continued its operations and in 1988 generated $136 million in revenues. From 1988 through most of 1989, LivingWell attempted to restructure its debt. In the meantime, Powercise, T.H.E., and Hfund failed. LivingWell then filed for bankruptcy protection in late 1989.[2] In October 1990, LivingWell ceased to operate and converted from a chapter 11 to a chapter 7 filing. David Askanase was appointed Trustee for LivingWell and FCA[3], a wholly owned subsidiary of LivingWell.

The Trustee sued most of LivingWell's directors, certain officers and control persons, LivingWell's auditors, Ernst & Young, and certain related parties. The Trustee sought damages and recovery of sums paid to the directors and their businesses during periods of alleged insolvency. He also claimed: 1) that LivingWell and its subsidiaries had made fraudulent transfers to directors and their businesses for less than fair value; 2) that

---

[2]LivingWell and its three wholly-owned subsidiaries, LW North, LW South, LW Midwest, filed for bankruptcy.

[3]Although FCA (Fitness Corporation of America) never filed for bankruptcy, the Trustee brings claims on behalf of FCA. His authority to do so is neither explained nor questioned.

the defendant directors and officers had breached their duties of due care and loyalty as well as their fiduciary duty; 3) that there was a fraud based conspiracy; 4) breach of contract, negligence, fraud and fraud based conspiracy against Ernst & Young; 5) that the directors and Ahmed Mannai, a large shareholder, had unlawfully redeemed stock. When LivingWell became insolvent was central to the determination of certain claims so the district court bifurcated the trial. In Phase One, which determined solvency, the court granted LivingWell's Rule 50(a) motion for a judgment as a matter of law finding that LivingWell was not insolvent before December 31, 1986. The question of insolvency thereafter was submitted to the jury, and it found that LivingWell was continuously insolvent from December 31, 1986 until it filed for bankruptcy in 1989. Because the Trustee failed to submit the issue of the LivingWell subsidiaries' solvency to the jury and no jury finding was made, the district court deemed those claims waived and determined that subsidiaries were solvent until bankruptcy was filed. Based on the jury verdict and the court's finding that the subsidiaries were not insolvent until filing, the Appellees filed a series of motions for summary judgment which the trial court granted. Thus, this appeal results from the district court's rulings during the insolvency trial and its rulings on defendants' motions made after the jury finding.

II

We turn first to the claims dismissed by summary judgment based on limitations.

7

A. Standard of Review

Summary judgment is reviewed *de novo* and the evidence is viewed in the light most favorable to the motion's opponent. *Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 292 (5th Cir.1990) Summary judgment is inappropriate when conflicting inferences and interpretations may be drawn from the evidence. *James v. Sadler,* 909 F.2d 834, 836-37 (5th Cir.1990).

B. Limitations

The trial court found that limitations barred the Trustee's trust fund claims, the director misconduct claims, the fraudulent transfers claim, and the negligence claims against Ernst & Young. The Trustee argues that the district court erred because either the court misconstrued the applicable law of limitations or alternatively did not toll the period.

1. Trust fund claims

The Trustee sued LivingWell's directors on the basis of the trust fund theory of Texas law claiming that the directors breached their fiduciary duty to LivingWell when they caused LivingWell and its subsidiaries to make certain payments to them and their businesses. The Trustee contends that the district court erred in granting summary judgment against all trust fund claims arising before October 27, 1987[4] because it applied a two year period of limitations. Incredibly, the Trustee argues that in Texas a four year statute of limitations applies because four years is the

---

[4]LivingWell filed for bankruptcy October 27, 1989; therefore a two year statute of limitations would bar all claims arising before October 27, 1987.

8

limitations period for the recovery of monies paid to a director/officer-trustee based on a breach of fiduciary duty. *Peek v. Berry,* 143 Tex. 294, 184 S.W.2d 272, 275 (1944). Additionally, Appellant contends that the four year limit should apply because that is the limit for a breach of fiduciary duty claim which subsumes a constructive fraud claim. *Spangler v. Jones,* 797 S.W.2d 125, 132 (Tex.App.—Dallas 1990, writ denied).

The district court was correct. The applicable period of limitations is two years. Appellant relies heavily on *Spangler v. Jones,* 797 S.W.2d 125 (Tex.App.—Dallas 1990, writ denied) and our cases that follow its reasoning. *See e.g., Sheet Metal Workers Local No. 54 v. E.F. Etie Sheet Metal Co.,* 1 F.3d 1464, 1469 (5th Cir.1993), *cert. denied,* 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994). However, we rejected the reasoning of *Spangler* and our cases that followed it in *Kansa Reinsurance v. Congressional Mortg. Corp.,* 20 F.3d 1362, 1374 (5th Cir.1994):

> [I]n *Williams [v. Khalaf,* 802 S.W.2d 651 (Tex.1990) ], Texas' highest court expressly stated that: "... In general, torts developed from the common law action for "trespass", and a tort not expressly covered by a limitation provision nor expressly held by this court to be governed by a different provision would presumptively be a "trespass' for limitations purposes. The same common law development simply does not apply to fraud as to most other torts." [*Id.*] at 654-55. Breach of fiduciary duty is clearly a "tort" under Texas law and thus, would appear to fall within this reasoning. Moreover, the Texas Supreme Court declined to overrule prior decisions setting forth a two-year statute of limitations for certain similar tort claims, such as legal malpractice and breach of the duty of good faith and fair dealing, which had been raised as analogies for employing the two-year statute of limitations for fraud. *Williams,* 802 S.W.2d at 654 n. 2. For these reasons, we do not find persuasive the reasoning in *Spangler* that *Williams* dictates the application of the four-year statute of limitations for fiduciary duty claims and decline to follow the opinions of this court which rely upon

9

*Spangler.*

Moreover, *Smith v. Chapman,* 897 S.W.2d 399 (Tex.App.-Eastland 1995) held that the trust fund theory puts directors in a fiduciary relationship to the creditors. *Id.* at 402. A breach of that duty gives rise to the cause of action and is subject to a two year statute of limitations. *Id.* Thus, the statute of limitations for the trust fund claim is two years.

The Trustee further argues that even if the applicable period is two years, limitations is tolled because the discovery rule applies. The discovery rule, which applies to both the act and the injury, requires that a claim be (a) inherently undiscoverable and (b) objectively verifiable. S.V. v. R.V., 933 S.W.2d 1,6 (Tex.1996). Moreover, the Trustee contends, even if the discovery rule does not apply, the adverse domination theory tolls limitations. For this tolling principle to apply, the interested directors must constitute a majority of the board of directors, *FDIC v. Henderson,* 61 F.3d 421, 428 (5th Cir.1995), and the Trustee must show intentional misconduct by the directors. *RTC v. Acton,* 49 F.3d 1086, 1091 (5th Cir.1995).

Neither the discovery rule nor the adverse domination theory tolls limitations in this case. The discovery rule assumes that the wrongful act is inherently undiscoverable. S.V. v. R.V., 933 S.W.2d at 6. This assumption is in direct conflict with the general rule that courts are to impute an officer/director's knowledge to the corporation. *See FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992)(imputing a bank officer's knowledge to the bank). Texas

10

law applies the imputation principle to determine when the statute of limitations begins to run on a corporation's claim. *FDIC v. Shrader & York,* 991 F.2d 216, 222 (5th Cir.1993), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). Courts will impute knowledge to the corporation as long as the officer/director is acting on the corporation's behalf. *FDIC v. Ernst & Young,* 967 F.2d at 171. As this sentence implies and as the Appellees acknowledge there is an exception to imputation. If the plaintiff can show that the officer/director was acting adversely to the corporation and entirely for his own or another's purpose, then limitations will be tolled. *FDIC v. Shrader & York,* 991 F.2d at 223-24. The officer/director, though, must act so that his endeavors are so incompatible that they destroy the agency. *Id.* Appellant has made no showing that the Appellees acted entirely for their own purpose. Appellant argues that the Appellees breached their fiduciary duty by unlawfully preferring themselves; however, while there is some evidence that the corporation overpaid for some transactions, we agree with the district court that this evidence does not raise a material fact issue that the Appellees acted entirely for their own purposes.

Nor does the adverse domination exception toll the statute. Assuming that the interested directors are a majority, the Trustee must also prove intentional misconduct. *RTC v. Acton,* 49 F.3d at 1090-91. In *Acton,* this Court held that mere negligence was insufficient to trigger adverse domination. *Id.* There had to be active participation in wrongdoing. In *FDIC v. Dawson,* 4 F.3d

11

1303, 1312 (5th Cir.1993), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2673, 129 L.Ed.2d 809, this Court implied that breach of fiduciary duty was not sufficient to trigger adverse domination:

> "We do not believe that Texas courts would extend the "very narrow doctrine', *Shrader & York,* 991 F.2d at 227, of adverse domination to cases in which the wrongdoing by a majority of the board amounts to mere negligence. To do so would effectively eliminate the statute of limitations in all cases involving a corporation's claims against its directors."

There must be active participation in wrongdoing or fraud. *Id.* Even gross negligence is not enough. *RTC v. Acton,* 49 F.3d at 1091. Moreover, in *RTC v. Bright,* 872 F.Supp. 1551, 1565 (N.D.Tex.1995), the court found that breach of fiduciary duty does not satisfy *Dawson* 's active fraud requirement. As the district court explained, under Texas law, breach of fiduciary duty is constructive fraud by virtue of the breach itself. *Id.* Constructive fraud does not require active participation because a duty may be breached through mere negligence. Here, as the Trustee alleges in his Second Amended Complaint, he seeks to recover *all* preferential payments made to Appellees "regardless of whether the payment was for a lawful purpose or [a] permissible debt owing by the Company to the director." Such a claim does not allege intentional wrongdoing.

We affirm the district court's grant of summary judgment against all trust fund claims that arose before October 27, 1987.[5]

2. Director misconduct claims

Again, the Trustee contends that the district court erred in

---

[5]We address the remaining trust fund claims in section III C hereof.

granting summary judgment based on a two year statute of limitations. He argues that the misconduct was a breach of fiduciary duty and intentional wrongdoing which entitled him to a four year limitations period. For the reasons stated above, we disagree.

In response to the claim of intentional misconduct, the Appellees argue that the Trustee did not allege fraud in Count I (corporate waste, mismanagement, negligence, gross negligence, and breach of fiduciary duty of officers and directors) of the First Amended Complaint. Nor did the Trustee add any new allegations in the Second Amended Complaint. In fact, in the Plaintiff's Response and Opposition to Defendant's Rule 9, 12(e), and 12(b) Motions to Dismiss, Appellant stated that "five of the six claims that collectively comprise Count I are not even arguably fraud based." While Appellant acknowledged that breach of fiduciary duty is constructive fraud, he argued vociferously that constructive fraud is not actual fraud and thus, his claim is not fraud based. The Trustee stated in his Response:

> As they did in their original motion to dismiss, the defendants further devote a considerable portion of their efforts to the proposition that *fraud* pleadings must sufficiently specify which defendants committed which fraudulent acts ... This proposition remains undoubtedly true and especially so in cases alleging common law fraud, securities fraud, and/or RICO violations, all of which are subject to Rule 9(b)'s heightened pleading requirements. This case, however, invokes *none* of those types of claims. (emphasis in the original)

The Trustee contends in this Court that his response in the district court to the First Amended Complaint cannot be used against him because he made new allegations of fraud in the

13

Supplemental Complaint. He contends that he clearly stated that Appellees joined Ernst & Young in a fraud-based conspiracy; therefore, the period of limitations is four years. This argument ignores, however, the fact that the conspiracy claim was brought against Ernst & Young only. The Trustee brought no new claims against the LivingWell directors. We affirm the district court's finding that the period of limitations is two years.

The Trustee again argues that even if the period of limitations is two years, the adverse domination theory tolls the statute. For the reasons stated in section 1 above, adverse domination does not toll the statute. Therefore, we affirm the trial court's finding that the director misconduct claims that arose before October 27, 1987 are time barred.

3. Fraudulent transfers

Both Appellant and Appellee agree that the limitations period for fraudulent transfers is four years and that no claim after October 27, 1985 is barred. The Trustee claims, however, that the claims before October 27, 1985 are not barred because the discovery rule applies. Additionally, the Trustee argues that the district court erred by ruling that the adverse domination theory did not apply because the Trustee could not show that the directors were active participants in wrongdoing. For the reasons discussed in section 1 above, we affirm the district court's ruling that all fraudulent transfer claims arising before October 27, 1985 are barred.

We also affirm the district court's finding that limitations

14

had run on all of FCA's[6] transfers made before October 25, 1987.[7] All issues not briefed are waived. *Villanueva v. CNA Ins. Co.,* 868 F.2d 684, 687 n. 5 (5th Cir.1989); *Cinel v. Connick,* 15 F.3d 1338, 1345 (5th Cir.1994). Here, the Appellant does not contest this finding in his brief.

4. Negligence claim against Ernst & Young

The statute of limitations for negligence in Texas is two years from the time the tort was committed. TEX. CIV. & REM. CODE § 16.003(a) (Vernon 1994); *Kansa,* 20 F.3d at 1372. Here, Ernst & Young completed its allegedly negligent audit opinion March 31, 1987, and LivingWell did not file for bankruptcy until October 27, 1989; therefore the claim was already time barred at the time of bankruptcy. Thus, unless the Trustee can show that the statute was tolled, the negligence claim against Ernst & Young is time barred.

The Trustee argues that the discovery rule tolls the statute of limitations and that the directors were unaware of the allegedly negligent audit; however, this argument is specious. The Trustee contradicts himself in his own brief. He argues that the directors had knowledge of the allegedly negligent audit and intended that the audit be inaccurate when he argues the fraud and conspiracy claims against Ernst & Young. When he argues the negligence claim, however, the Trustee asks this Court to disregard his claims of

---

[6]FCA, Fitness Corporation of America, is a wholly owned subsidiary of LivingWell. The Trustee filed its suit against the Appellees on behalf of LivingWell and FCA.

[7]FCA never filed for bankruptcy; however, the Trustee filed this suit on FAC's behalf October 25, 1991. Thus, the four year statute bars all claim arising before October 25, 1987.

15

knowledge and intent. He cannot have it both ways. If the directors had the requisite knowledge and intent for the fraud and conspiracy claims, then that knowledge is imputed to the corporation unless the Appellant makes a showing of adverse interest. *See FDIC v. Shrader & York,* 991 F.2d at 223-24. As previously noted, Appellant has made no showing that the directors acted entirely for their own interest and against the interests of the corporation; therefore, Appellant has failed to make a showing of adverse interest.

In the alternative, the Trustee argues that Ernst & Young fraudulently concealed its wrongdoing and that the LivingWell directors conspired with Ernst & Young to conceal their misconduct. Again, this argument is contradictory. Either the directors knew or they did not know of the allegedly bad audit. If the directors knew, then the knowledge is imputed to the corporation. *See FDIC v. Shrader & York,* 991 F.2d at 223-24.

Moreover, even if the directors were unaware that the audit was performed negligently, the discovery rule would still not apply. As stated earlier, the discovery rule requires (a) inherent undiscoverability and (b) objectively verifiable evidence. S.V. v. *R.V.,* 933 S.W.2d at 6. Objectively verifiable evidence is the key factor for determining the discovery rule's applicability. *Id.* The Trustee states that he has a "plethora of contemporaneous records" verifying Ernst & Young's misconduct, but the only evidence of these records is a cite to the record that does not exist. Trustee's Reply Brief p. 43-44, citing R. 58/15791.

16

Finally, in the face of directly contrary authority, the Trustee claims that the statute is tolled by the doctrines of repeated reassurance and continuous representation. The Trustee contends that the Texas Supreme Court adopted the rule of continuous representation in *Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 157 (Tex.1991), *Gulf Coast Inv. Corp. v. Brown,* 821 S.W.2d 159, 160 (Tex.1991), and *Rowntree v. Hunsucker,* 833 S.W.2d 103, 104-08 (Tex.1992); however, the Trustee is incorrect in his understanding of these cases. *Hughes* and *Gulf Coast* stand for the proposition that when an attorney commits malpractice, the statute of limitations is tolled on the malpractice claim until all appeals on the underlying claim are exhausted. *Hughes,* 821 S.W.2d at 157; *Gulf Coast Inv. Corp.,* 821 S.W.2d at 160. *Rowntree* is a medical malpractice case that decides when a continuing course of treatment ended for tolling purposes. *Rowntree,* 833 S.W.2d at 106-08.

Not only does Appellant incorrectly interpret the above cases, but the Texas Supreme Court in *Willis v. Maverick,* 760 S.W.2d 642 (Tex.1988) held that the continuous representation doctrine does not apply in Texas. There, the court held that the discovery rule was more in line with previous Texas cases and better balanced the policies underlying the statute of limitations. *Id.* at 645 n. 2. Therefore, we affirm the district court's holding that the Trustee's negligence claim against Ernst & Young is barred.

### III

We review now claims not disposed of by limitations.

A. Standard of Review

17

As before, claims decided on summary judgment are reviewed *de novo.* Decisions to admit or exclude evidence are reviewed for abuse of discretion. *Kelly v. Boeing Petroleum Services, Inc.,* 61 F.3d 350, 356 (5th Cir.1995). Findings on choice of law, the definition of insolvency, the applicability of the trust fund doctrine, the motions to strike, the Rule 49(a), Rule 50(a), Rule 12(b)(6) and Rule 9(b) motions to dismiss are also reviewed *de novo.* *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Joslyn Mfg. Co. v. Koppers Co.,* 40 F.3d 750, 753 (5th Cir.1994); *Little v. Liquid Air Corp.,* 37 F.3d 1069 (5th Cir.1994) (*en banc* ); *Conkling v. Turner,* 18 F.3d 1285 (5th Cir.1994). Admissibility of expert witness testimony is reviewed for manifest error. *Christophersen v. Allied Signal Corp.,* 939 F.2d 1106, 1109-10 (5th Cir.1991) (*en banc* ).

B. Insolvency on a Consolidated Basis

Following the trial on insolvency, the Appellees moved for summary judgment on the fraudulent conveyance and trust fund claims asserted against the subsidiaries. The Trustee argued that LivingWell and its subsidiaries were a single business enterprise, and the jury's finding that LivingWell was insolvent as of December 31, 1986 was the same as finding LivingWell and the subsidiaries insolvent as a single business enterprise.[8] The Appellees countered by filing a Rule 49(a) motion requesting that the district court find that LivingWell and its wholly owned

_____

[8]We do not address the single business enterprise theory for reasons explained below.

18

subsidiaries were not insolvent on a consolidated basis at any time before October 27, 1989. Under Rule 49(a), if the court requires the jury to return only a special verdict in the form of a special written finding upon each issue of fact and the verdict omits any issue of fact raised by the pleadings or evidence, then each party waives the right to a jury determination of the omitted issue. The court is then free to supply the finding on the issue. FED. R. CIV. P. 49(a).

The district court granted both the summary judgment motions and the Rule 49(a) motion. In granting summary judgment, the district court stated that Appellant had failed to raise his single business enterprise theory during the insolvency trial. Appellant had, instead, treated the subsidiaries as separate from LivingWell. The court held that the evidence, therefore, failed to establish the subsidiaries' insolvency and so found the subsidiaries solvent at all relevant times. Because they were solvent at all relevant times and because the record indicated that the businesses maintained separate books, the court found the single business enterprise theory inapplicable. Thus, the court granted summary judgment for all preference and fraudulent conveyance claims against the LivingWell subsidiaries. While it is unclear why the district court granted both the motion for summary judgment and the Rule 49(a) finding, we hold that the district court did not err in making the Rule 49(a) finding. Having made that finding, the Trustee's single business enterprise theory is deprived of a factual basis upon which to stand, and we do not address it.

19

Appellant correctly states that a Rule 49(a) finding cannot be inconsistent with the jury verdict. *McDaniel v. Anheuser-Busch, Inc.,* 987 F.2d 298, 306-307 (5th Cir.1993). The Appellant argues that the Rule 49(a) finding is inconsistent because, since the jury found LivingWell insolvent, then by definition LivingWell on a consolidated basis was insolvent. In support, the Trustee points out that LivingWell's assets included the stock of its three wholly owned subsidiaries: LW North, LW South, and LW Midwest. In calculating the effect of the subsidiaries' stock on LivingWell's worth, the Trustee argues that the subsidiaries assets have a positive value when their fair market value exceed liabilities and a zero value when liabilities exceed assets. Thus, LivingWell's balance sheet solvency necessarily determines the solvency of its subsidiaries.

We reject the Trustee's arguments. The finding is not inconsistent with the verdict. As the Appellees point out, the Trustee cites no legal or accounting authority for his argument that LivingWell's solvency necessarily determines the solvency of its subsidiaries. For example, the Trustee argues that the subsidiaries' stock value was equal to their assets minus their liabilities. Stock, however, is not valued so easily. There are other factors to take into account such as the type of stock and its marketability. *See* S. Ritchie and J. Lamberth, *The Valuation Process of Closely Held Corporate Stock,* 54 Tex. B.J. 548, 550-54 (1991). Moreover, according to accounting standards of the Financial Accounting Standards Board, intercompany balances and

20

transactions are eliminated when considering a company on a consolidated basis. These intercompany balances and transactions include open account balances, security holdings, sales and purchases, interest, and dividends. Intercompany loss or profit is not considered. GENERAL STANDARDS, Consolidation Procedure Generally, § C51.109 (Financial Accounting Standards Bd.1986). Additionally, it could be that LivingWell's subsidiaries were solvent but that LivingWell's debts were so great that LivingWell on a consolidated basis is insolvent. Thus, LivingWell's balance sheet solvency does not necessarily determine the solvency of its subsidiaries; therefore, we affirm the district court's Rule 49(a) finding that LivingWell and its subsidiaries were not insolvent on a consolidated basis until October 27, 1989.

C. LivingWell's Insolvency

1. Choice of Law

Federal courts sitting in Texas apply the law of the state of incorporation when a corporation's internal affairs are implicated. *Maher v. Zapata Corp.,* 714 F.2d 436, 464 (5th Cir.1983). The Trustee contends that the court erred in deciding that Texas law controlled all trust fund claims. He contends that because trust fund doctrine claims cannot exist unless the payee of the challenged transaction is a director of an insolvent company, the trust fund claims here implicate the internal affairs of LivingWell. Further, because LivingWell reincorporated in Delaware June 12, 1985, Delaware law should control all trust fund claims arising after that date.

In *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982), the Supreme Court defined the internal affairs of a corporation as "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders[.]" The question, here, then is whether allegedly preferential transfers in a bankruptcy context are matters peculiar to the relationship between a corporation and its directors and officers. We hold they are not. Here, the trust fund claims involve the rights of third party creditors. These claims, then, are not peculiar to the relationship between LivingWell and its officers and directors.

Having decided that the place of incorporation does not decide necessarily which law to apply to the trust fund claims arising as of June 12, 1985, we must still decide what law does apply. To do so, we look to the Restatement (Second) of Conflict of Laws. Section 301 states that when a corporation acts in a way that an individual can, the choice of law principles that apply to non-corporate parties apply to the corporation. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 301 (1971). Those principles, referred to as the "most significant relationship" test, are stated in § 6[9], and Texas has adopted and applies that test. *Duncan v.*

---

[9] § 6 Choice-of-law Principles states in pertinent part:

> (2) When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> >
> > (b) the relevant policies of the forum,

22

*Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984). Thus, we apply that test. Here, LivingWell's only tie with Delaware is that it was incorporated there; however, its principal place of business was in Texas, the challenged payments were made from Texas, LivingWell's board met in Texas, and LivingWell's principal asset, the Houstonian, was in Texas. Therefore, we affirm the district court's holding that Texas law and not Delaware law applies.

2. The Merits

To bring a trust fund claim in Texas, the corporation must be insolvent and have ceased doing business when the challenged transactions occurred. *Mancuso v. Champion (In re Dondi Financial Corp.)*, 119 B.R. 106, 111 (Bankr.N.D.Tex.1990).

The Trustee makes several claims as to both elements. First, he argues that the district court erroneously restricted his proof of insolvency to the balance sheet test which focuses on whether liabilities exceeded assets at a fair valuation. *See* 11 U.S.C. § 101(32). Rather, the Trustee, pointing to *Fagan v. La Gloria Oil*

---

(c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*& Gas Co.,* 494 S.W.2d 624, 629 (Tex.Civ.App.–Houston (14th Dist.) 1973), claims that he was entitled to prove insolvency either through the balance sheet test or by showing that LivingWell was unable to meet currently maturing debts in the ordinary course of business. Assuming *arguendo* that the Trustee is correct, the error is harmless. The Trustee wants to use the second definition of insolvency to prove that LivingWell was insolvent before December 31, 1986; however, Appellant's trust fund claims arising before October 27, 1987 are time barred. Thus, the error is harmless.

Second, the Trustee contends that the court erroneously excluded evidence which he contends would have shown that LivingWell was insolvent before December 31, 1986. Again, assuming *arguendo* that the court erred, the error is harmless since all claims arising before October 27, 1987 are time barred.

Third, the Trustee contends that the district court erred in granting the Rule 50(a) motion finding that LivingWell was, as a matter of law, solvent for all periods before December 31, 1986. Again, the error was harmless for the reasons stated above.

The Trustee's final argument concerning trust fund claims is that the district court erred in granting summary judgment dismissing the remaining trust fund doctrine claims. As mentioned above, to pursue a successful trust fund claim, one must prove that a corporation is a) insolvent and b) ceased to do business at the time of the challenged transaction. *Fagan v. La Gloria,* 494 S.W.2d at 628. If the plaintiff, however, cannot show that the corporation has ceased doing business, his claim may still succeed

24

if the plaintiff can show that the corporation has ceased doing business in good faith. *Id.* at 631. Here, the Trustee claims that there was substantial evidence that the Appellees acted in bad faith. In support of his argument, the Trustee refers to his summary of evidence and the testimony of three witnesses: Knepper, Harris, and Schwartz. This evidence however is not sufficient to overcome summary judgment. The summary of evidence is nothing but a summation of conclusory affidavit testimony, and the testimony of the first two witnesses was inadmissible for reasons explained below in section III E. As for the third witness, Schwartz, he merely states that certain data suggest that one transaction was suspect. Therefore, we affirm the district court's dismissal of the trust fund claims.

D. The Subsidiaries' Insolvency

The district court granted Appellee's 50(a) motion finding that the subsidiaries were solvent until October 27, 1989. Appellant argues that this finding was error because he had both direct and indirect evidence of the subsidiaries, insolvency under either the balance sheet or the equity test. The Trustee, however, points to no evidence the subsidiaries' liabilities were greater than their assets. Rather, he discusses LivingWell's insolvency. As previously noted, the fact that LivingWell was insolvent does not necessarily show the subsidiaries' insolvency.

In arguing that the subsidiaries were insolvent under the equity test because they were unable to pay their debts as they matured, the only evidence the Trustee offers is the testimony of

25

Randy Watson who testified that "We showed nice profits, but cash flow-wise, we were broke." This testimony concerned only LivingWell South and is not enough to overturn the Rule 50(a) finding. We affirm the district court's finding that LivingWell's subsidiaries were not insolvent before October 27, 1989.

The Trustee contends that the district court erred in refusing to allow the Trustee to recover payments FCA made as a nominee for LivingWell. The district court found, and the Trustee does not dispute, that the statute of limitations barred the recovery of transfers of money that belonged exclusively to FCA.[10] While Appellant argued he could still recover transfers FCA made as a nominee of LivingWell, the court rejected that argument stating this claim fell within the "single business enterprise" claims which the court had already rejected. The Trustee argues that the "single business enterprise" theory is irrelevant as recovery is simply a matter of agency or nominee relationship. Appellant, though, does not offer this Court any evidence of agency or a nominee relationship; therefore, we have no basis upon which to reverse the district court. We affirm the district court's grant of summary judgment on all trust fund claims based upon transfers FCA made before October 27, 1989.

E. Director Misconduct

Appellant argues that the district court erroneously excluded

---

[10]FCA never filed for bankruptcy so § 108(a) of the Bankruptcy Code does not apply. The statute of limitations is two years and this suit was filed October 25, 1991; thus, all claims arising before October 25, 1989 are barred.

26

or ignored his evidence of director misconduct.  In the case of William Knepper, one of Appellant's experts, the court ruled the proffered testimony inadmissible because Knepper was a lawyer and his testimony would be conclusory and cumulative.  The Trustee argues that this was manifest error because the fact that Knepper is a lawyer does not *per se* disqualify him as an expert witness.  Rather, the issue is whether Knepper had specialized training, education, and experience that would enable him to assist the jury in determining issues of director misconduct.  The Trustee contends that Knepper has the necessary training, education, and experience because Knepper has been practicing law for 60 years, 25 of which were in the fields of corporate officer and director liability, director's and officer's indemnity insurance, and professional liability insurance.

We agree that merely being a lawyer does not disqualify one as an expert witness.  Lawyers may testify as to legal matters when those matters involve questions of fact.  *See e.g., Huddleston v. Herman & MacLean,* 640 F.2d 534, 552 (5th Cir. Unit A March 1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)(lawyer could testify that language in a boilerplate contract was standard because the effect of the language went to scienter).  However, "it must be posited as an *a priori* assumption [that] there is one, but only one, legal answer for every cognizable dispute.  There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge."  *Specht v.*

27

*Jensen,* 853 F.2d 805, 807 (10th Cir.1988) (internal citations omitted).

The *Specht* case involved a warrantless search. There, the plaintiff's expert witness testified that warrantless searches were unlawful, that the defendants committed a warrantless search, that the only possible exception was unavailable, and that the acts of an individual could be imputed to the accompanying officer under § 1983. *Id.* at 808. The Tenth Circuit held that such testimony was not only inadmissible but harmful. The Court stated that while experts could give their opinions on ultimate issues, our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury. *Id.* at 808-09. Moreover, allowing attorneys to testify to matters of law would be harmful to the jury. *Id.* at 809. First, the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word "expert" and once the jury hears of the attorney's experience and expertise, it might think the witness even more reliable than the judge. *Id.* Second, if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury. *Id.* Thus, the issue here is whether Knepper is testifying to purely legal matters or legal matters that involve questions of fact.

In the report that Knepper submitted to Appellant, he stated that he would give his opinion on "[w]hether LivingWell's officers

and directors fulfilled their fiduciary duties to the Company, its creditors, and shareholders. If not, how and to what extent did [they] breach their fiduciary duties." Such testimony is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for Knepper to tell the trier of fact what to decide. Therefore, the trial court did not err in finding Knepper's testimony inadmissible.

Even without Knepper's testimony, the Trustee argues he could still prove director misconduct through his summary of evidence, through the testimony of other expert witnesses, and through the affidavit of a former LivingWell employee, Russell Harris.

Most of the "substantial evidence" in the summary of evidence was either based on claims that were time barred or based on conclusory statements in affidavits. The evidence that does not fall within these two categories, such as statements that the board of LivingWell declined to issue written directions to its consultants, is not sufficient to overcome summary judgment.

As for the testimony of the other expert witnesses, their opinions either were based on claims that are time barred or were tentative and preliminary and therefore insufficient to overcome summary judgment. Moreover, the district court properly sustained the objection to Russell Harris' affidavit. While it purports to show personal knowledge on its face, there is sufficient sworn testimony to show that he does not have personal knowledge.

For the above reasons we affirm the district court's grant of

29

summary judgment on the director misconduct claims.

F. The Fraudulent Transfers

The Trustee brings his fraudulent transfer claims under TEX. BUS. & COM. CODE § 24.006(a) which requires the claimant to prove that the transferor was (1) insolvent at the time of the transfer and (2) received less than fair value for the consideration it paid. We assume, and the Appellees do not contest, that the Trustee has standing to avoid the preferences LivingWell made.[11]

The district court dismissed both LivingWell's fraudulent transfer claims arising before December 31, 1986 and the subsidiaries' claims arising before October 27, 1989. The Trustee argues that this was error because there was substantial evidence that LivingWell and its subsidiaries transferred money and assets while insolvent for less than fair value. To prove that the district court erred where the subsidiaries are concerned, the Trustee again argues the single business enterprise theory. For the reasons stated above in section III D, we reject that theory and affirm the district court's finding that the subsidiaries were solvent at all times before October 27, 1989.

As for LivingWell, the Trustee argues that the finding that LivingWell was not bankrupt before December 31, 1986 was error. We agree. TEX. BUS. & COM. CODE § 1.201 states that unless otherwise provided the definition of "insolvent" is either a person who has

---

[11]We do affirm, however, the trial court's holding that the Trustee does not have standing to bring FCA's fraudulent transfer claims. While the Trustee argues that he has standing because FCA is a nominee of LivingWell, that argument fails for the reasons stated in section III D hereof.

ceased to pay bills in the ordinary course of business or cannot pay debts as they come due or is insolvent within the meaning of the federal bankruptcy code. TEX. BUS. & COM. CODE § 1.201(23). Appellees argue that this is not the correct definition because until 1993 the definition was "generally unable to pay debts" not cannot pay debts. Assuming *arguendo* that the Appellees are correct, the trial court still erroneously limited the definition of insolvency to the balance sheet test. The error, however, was harmless because the Trustee has not raised an issue of fact as to lack of fair value.

The Trustee has preserved error with regard to four transactions: the Gold Membership, the advertising fees paid to Hemelgarn Racing, the equipment rental payments made to MWB Leasing, and the payments to the Officer & Director ("O & D") insurance trust. While the Trustee does mention "other transactions" such as salary and consulting fees, he does not tell this Court either the place in the record to find the evidence or what the evidence is that supports his claim of excessive fees and salaries. Both are required. *Moore v. FDIC,* 993 F.2d 106, 107 (5th Cir.1993).

The Appellees argue that the claim regarding the Gold Membership is baseless because the transferee is not a party to the appeal. Because the Trustee had settled with the transferee, the Trustee can no longer pursue this fraudulent transfer claim. The Trustee did not respond to this argument so we assume that the Trustee was made whole by the settlement.

31

As for the advertising fees paid to Hemelgarn Racing, Inc., the Trustee relies wholly upon an expert witness report. The expert's report, though, states that his conclusions are "tentative and preliminary". Such evidence is not sufficient to overcome summary judgment. The same problem afflicts the expert report on the value of the lease payments made to MWB Leasing. There, the expert states that his opinion is only preliminary and is subject to a full appraisal report. In fact, he only states "the actual payments *appear* to be excessive in the range of approximately 20% over fair market value" (emphasis added). Again, such evidence is not sufficient to overcome summary judgment.

The Trustee's final fraudulent transfer claim involves the O & D insurance trust fund. This claim also fails. The sole basis for the Trustee's claim that no value was received for the transfer was the testimony of the lawyer, Knepper. For reasons which we explained above, Knepper's testimony was excluded. Because the evidence supporting the O & D insurance trust fund claim fails, the claim also fails. Therefore, we affirm the district court's grant of summary judgment for the fraudulent transfer claims.

G. Unlawful Stock Redemption

The Trustee alleges that on March 31, 1988 LivingWell redeemed some of its stock by reacquiring LivingWell common stock owned by Hfund. Because LivingWell is a Delaware corporation, Delaware law controls. Section § 160(a)(1) of the Delaware General Corporation Law states in pertinent part:

> Every corporation may ... redeem ... its own shares; provided, however, that no corporation shall: (1) ... redeem

32

its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such ... redemption would cause any impairment of the capital of the corporation[.] DEL. CODE ANN. tit. 8, § 160(a)(1) (1996).

The purpose of the statute is to protect creditors. *In re Reliable Manufacturing Corporation,* 703 F.2d 996, 1001 (7th Cir.1983). The statute is designed to prevent a corporation from rearranging its capital structure so as to alter the assumed basis upon which creditors have extended credit. *Id.* In other words, the statute prevents a corporation from defrauding its creditors by redistributing assets to its shareholders. *Id.*

We assume without deciding that there was a redemption. Moreover, LivingWell, by jury finding, was insolvent when the assumed redemption occurred. Thus the corporation was impaired. The issue, however, is whether LivingWell redeemed the stock to defraud its creditors. The Trustee does not show this Court how the redemption defrauded LivingWell's creditors. On the contrary, the Appellees offer evidence that the redemption was part of dispute settlement and enabled LivingWell to pay off certain existing debts. LivingWell's redemption does not fall within the purposes of § 160; therefore, we affirm summary judgment.

H. Claims Against Majority Shareholder Mannai

There are three claims the Trustee alleges against LivingWell's majority shareholder, Ahmed Mannai, and his companies. First, that Mannai himself participated in intentional misconduct, fraud-based conspiracy, and wrongdoing. Second, that Mannai and his companies received payment for the unlawful stock redemption, and third, that Mannai is liable as a director because of his

33

control over LivingWell's board of directors, including the placement of his agents on the board. The district court dismissed the first two claims for being inadequately pled because they were not specified in the Second Amended Complaint and because the Trustee stated in his deposition that the agency theory was the exclusive basis for suing Mannai.[12] The Trustee contends that this was error because a theory of recovery does not have to be stated specifically; rather, the pleadings only have to give adequate notice. The Trustee, however, does not show this Court how his Second Amended Complaint gives adequate notice. We affirm the dismissal of the first two claims.

The sole issue, then, is whether the district court erred in granting summary judgment on the Trustee's agency claim. The Trustee argues that a shareholder who controls an insolvent corporation stands in a fiduciary relationship to the corporation. 12B FLETCHER, CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS § 5765 (rev.perm. ed.1990). The Trustee contends that Mannai controlled the board of directors because he helped create LivingWell, was its largest shareholder, participated in the decision to create PAC and through one of his companies, to pledge LivingWell stock to borrow money through PAC. Moreover, he participated in the decision to create Hfund and owned 100% of the equity in that company. Most important, he controlled LivingWell by placing two of his agents on the board of LivingWell and Hfund. Assuming *arguendo* that all

_____

[12]In his deposition, the Trustee states that the sole basis for his allegation that Mannai was part of the directors who controlled LivingWell was his conservations with his counsel.

34

these statements are true, they do not show that Mannai completely dominated the board of LivingWell. As Appellees point out, and the Trustee does not contradict, during the periods that Mannai's two "agents" served concurrently on LivingWell's board, the LivingWell board had no fewer than eight members. Thus, they were never a majority of the board and Mannai could not have exercised complete domination. Therefore, we affirm the district court's grant of summary judgment for the claims against Mannai.

I. The Ernst & Young Claims

The Trustee's claims against Ernst & Young are for breach of contract, fraud, and fraud based conspiracy. The Trustee, to support the contract claim, merely tells this court that the trial court's 12(b)(6) dismissal of the claim was error and that he is entitled to recover the fees paid for the audit. As Ernst & Young correctly points out, we decided in *FDIC v. Ernst & Young*, 967 F.2d 166, 172 (5th Cir.1992) that Texas law does not permit a breach of contract claim based upon accounting malpractice. Therefore, we affirm the dismissal of the breach of contract claim.

In deciding the fraud and fraud based conspiracy claim, we address the fraud claim first because it is the underlying basis for the conspiracy claim. The trial court dismissed that fraud claim under Rule 9(b) which states that conclusory allegations of fraud are not sufficient to survive dismissal. FED. R. CIV. P. 9(b). The court found that the trustee had failed to plead facts to support his allegation of detrimental reliance. The Trustee argues that this was error because while Rule 9(b) has a heightened

35

standard of pleading, the challenged conduct involves so many complex transactions that less specificity is required. The Supplemental Complaint satisfies the purposes underlying Rule 9(b)'s heightened pleading requirement because it states who, what, when, where, why, and how the false statements were made and to whom they were made. Ernst & Young challenges the statement that the Supplemental Complaint advances a theory of detrimental reliance but for the purpose of this opinion, we assume it does. The Trustee argues that but for Ernst & Young's alleged misrepresentations, LivingWell would not have continued to exist, could not have incurred more debt, and would not have lost more money.

This theory of detrimental reliance is insufficient. Under Texas law, a cause of action is legally insufficient if the defendant's alleged conduct did no more than furnish the condition that made the plaintiff's injury possible. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995). The Trustee's theory would make Ernst & Young an insurer of LivingWell because Ernst & Young would be liable for LivingWell's losses no matter what created LivingWell's losses, i.e. a recession or a decline in the fitness industry. Because the Trustee does not adequately allege detrimental reliance, his fraud claim must fail. Moreover, because the fraud claims fails the fraud based conspiracy claim must fail also. Thus, we affirm the dismissal of the claims against Ernst & Young.

CONCLUSION

36

For the reasons stated above, we AFFIRM the take nothing judgment against the Trustee.