**Albert E. FAGAN et al., Appellants,**

v.

**La GLORIA OIL AND GAS COMPANY, Appellee.**

**No. 774.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

April 25, 1973.

Rehearing Denied May 16, 1973.

John A. Croom, Robert Levine, Pruitt & Monshaugen, Houston, for appellants.

Donald P. Butler, John B. Holstead, III, Vinson, Elkins, Searls, Connally & Smith, Houston, for appellee.

TUNKS, Chief Justice.

Cooper Petroleum Company (Cooper) is a Texas Corporation that was engaged in the marketing of petroleum products. The majority of its shares are owned by Albert E. Fagan. Its other shares are owned equally by Don Fagan, a son, Gerald Arnold and James Clark, sons-in-law of Albert E. Fagan. Those four individuals constitute all of the officers and directors of Cooper.

International Marketing, Inc. (I.M.I.) was also a Texas Corporation engaged in the marketing of petroleum products. Albert E. Fagan owned half of the shares of I.M.I. and the other half were pledged to him to secure his loan for their purchase price.

In 1964 I.M.I. was indebted to La Gloria Oil and Gas Company (La Gloria) for the purchase of petroleum products. I.M.I. was adjudged bankrupt. La Gloria filed suit in the district court of Harris County against Cooper and Albert E. Fagan. That suit was based upon the allegations that the defendants were guarantors of the account owed by I.M.I., the bankrupt, to La Gloria.

After I.M.I. was adjudged bankrupt the trustee in bankruptcy also filed suit against Cooper and Albert E. Fagan. That suit was filed in a federal district court. It was based upon allegations that those defendants had received voidable preferences as creditors of I.M.I. In that suit in June 1966, the trustee recovered a judgment against Cooper for $81,000 and against Albert E. Fagan for $59,000. Later the appellate court, in affirming, increased the principal amount of the judgment against Cooper to $121,000.

In January 1967 La Gloria recovered in its suit a judgment against Cooper for $160,000 and against Albert E. Fagan for $136,000. That judgment was appealed to this Court and was affirmed at 423 S.W.2d 645. It was, however, reversed by the Supreme Court (436 S.W.2d 889) and remanded for another trial. On retrial, on January 22, 1970, La Gloria was adjudged a recovery against Cooper for $160,000 and against Albert E. Fagan for $88,000. That judgment was affirmed by an unpublished opinion of the First Court of Civil Appeals and application for writ of error was not granted. It thereby became final and non-appealable on March 24, 1971. Thereupon Albert E. Fagan paid the judgment against him, but the judgment against Cooper remains unpaid.

In December 1967 the total of the judgment in favor of the trustee in bankruptcy and against Cooper and Albert E. Fagan, together with accrued interest and costs, amounted to about $220,000. On December 27, 1967, Albert E. Fagan paid the trustee $100,000 for which he was given a release of the judgment against him and an assignment of the judgment against Cooper. On the basis of his ownership of the judgment against Cooper, Albert E. Fagan filed judgment liens in those counties wherein Cooper owned realty—mostly filling station sites. This procedure effectively prevented La Gloria from reaching Cooper's realty by levy of execution.

Cooper did not supersede the judgment La Gloria got against it upon the second trial. While Cooper's appeal from that judgment was pending La Gloria levied execution but was unable to reach any property of significant value. La Gloria thereupon filed the suit from which this appeal was taken. It is a suit in the nature of a creditor's bill. It named Albert E. Fagan, Don Fagan, Gerald Arnold and James Clark as defendants. After a nonjury trial judgment was rendered against the defendants, jointly and severally, for $238,697.22. The defendants have perfected appeal. The substance of the appellants' conten-

tions is that the debt to La Gloria is owed by the corporation, Cooper, and that appellants have no personal liability for that debt under either the "trust fund doctrine" or the "alter ego" theory. Appellants do not complain of the amount of the trial court's judgment except that they say that James Clark who left Cooper in 1968 should not be held liable on the entire amount.

Appellee La Gloria counters with the contention that the personal liabilities of the defendants are sustainable under either the trust fund or alter ego theory. It also contends that the defendants wrongfully diverted Cooper's corporate assets to themselves for the purpose of preventing La Gloria from reaching those assets and, for that reason, the defendants are personally liable under the principles of equity. It contends that James Clark was a joint participant in the fraud against it and, as such, is jointly liable for the entire judgment.

As noted above, this case was tried before the court without a jury. No findings of fact or conclusions of law were requested or filed. We must, therefore, affirm the trial court's judgment if it can be upheld on any legal theory that is supported by the evidence. The judgment implies findings of fact that support it. No point of error presented by appellants questions the factual sufficiency or preponderance of the evidence as to any implied finding by the trial court. We must, therefore, in determining whether the evidence supports implied findings that constitute a lawful basis for the judgment, consider only that evidence consistent with such implied findings and disregard evidence to the contrary. Seaman v. Seaman, 425 S.W.2d 339 (Tex.Sup.1968); Bishop v. Bishop, 359 S.W.2d 869 (Tex.Sup.1962); Lebow v. Weiner, 420 S.W.2d 755 (Tex. Civ.App.—Houston (14th Dist.) 1967, no writ). It is with these rules as a guide that we examine the evidence in this case.

It is a basic rule of law that officers and directors of a corporation owe to it duties of care and loyalty. They stand in a fiduciary relationship to the corporation. Such duties, however, are owed to the corporation and not to creditors of the corporation. In ordinary circumstances where an officer or director negligently mismanages corporate business to its injury or takes to himself that which belongs to, or in fairness and equity should be acquired by, the corporation, a cause of action in behalf of the corporation arises. Such cause of action can be prosecuted only by the corporation, itself, or by someone authorized to act in its behalf. Such cause of action under some circumstances, may be prosecuted by one standing in the position of the corporation for the benefit of a creditor, but not directly by the creditor, himself. Such breaches of duty neither create a cause of action in a creditor of the corporation for the wrong done the corporation nor, without more, entitle the creditor to collect his claim from the officers and directors. Sutton v. Reagan & Gee, 405 S.W.2d 828 (Tex.Civ.App.—San Antonio 1966, writ ref'd n. r. e.).

There is a well recognized exception to that basic rule. That exception is frequently called the trust fund doctrine. Such exception, stated in general terms, is to the effect that when a corporation (1) becomes insolvent and (2) ceases doing business, then the assets of the corporation become a trust fund for the benefit, primarily, of its creditors. The officers and directors hold the corporate assets in trust for the corporate creditors. They are placed in a fiduciary relation to and owe a fiduciary duty to the creditors. That duty obliges them to administer the corporate assets for the benefit of the creditors and to ratably distribute them. The breach of that duty gives rise to a cause of action against the officers and directors which can be prosecuted directly by the creditors.

The Texas Supreme Court in Lyons-Thomas Hardware Co. v. Perry Stove

Manuf'g Co., 86 Tex. 143, 24 S.W. 16 (1893) held the trust fund doctrine to be the law of Texas. At page 25 of that opinion the following language of Corey v. Wadsworth, 99 Ala. 68, 11 So. 350, 353 (1892) was quoted as a correct statement of the law on this subject:

> " 'At what stage of a corporation's affairs must it be pronounced insolvent, so as to bring it within the principles we have declared? It is not enough that its assets are insufficient to meet all its liabilities, if it be still prosecuting its line of business, with the prospect and expectation of continuing to do so,—in other words, if it be, in good faith, what is sometimes called a "going" business or establishment. Many successful corporate enterprises, it is believed, have passed through crises where their property and effects, if brought to present sale, would not have discharged all their liabilities in full. We feel safe in declaring that when a corporation's assets are insufficient for the payment of its debts, and it has ceased to do business, or has taken, or is in the act of taking, a step which will practically incapacitate it for conducting the corporate enterprise with reasonable prospect of success, or its embarrassments are such that early suspension and failure must ensue, then such corporation must be pronounced insolvent.' "

Among other Texas cases that hold the rule applicable are Waggoner v. Herring-Showers Lumber Co., 120 Tex. 605, 40 S.W.2d 1 (1931); Orr & Lindsley Shoe Co. v. Thompson, 89 Tex. 501, 35 S.W. 473 (1896), and Wortham v. Lachman-Rose Co., 440 S.W.2d 351 (Tex.Civ.App.—Houston (1st Dist.) 1969, no writ).

Cooper's records were kept on the basis of a fiscal year ending on June 30. Its balance sheet on June 30, 1966, showed a stated capital of $150,000 and, in round figures, an earned surplus of $102,000. However, that balance sheet, despite the fact that the trustee in bankruptcy had got

a judgment against Cooper for $81,000 less than a month earlier, failed to show any liability related to that judgment. The accountant's note to that statement referred to the judgment and explained his failure to show it as a liability by saying, " . . ., in the opinion of the company's legal counsel, the judgment in its entirety is erroneous and will be reversed." (In fact, that judgment not only was not reversed, but its principal amount was increased by $40,000.) Also on that date La Gloria had pending a suit against Cooper that ultimately resulted in a final judgment for $160,000. The balance sheet did not reflect that claim as a basis for any stated liability. The accountant's failure to so reflect it is again explained as being based on the opinion of the company's counsel that the plaintiff would be unsuccessful in the suit.

Not only was there evidence that Cooper's liabilities were understated on its 1966 balance sheet, but also there was evidence that its assets were overstated. Listed as an asset was an account receivable in the amount of $192,000. The evidence showed this item represented money advanced in an oil and gas venture and was repayable only out of the profits, if any, of such venture. At the date in question there was little prospect that any substantial part of it would ever be repaid.

There was evidence to support an implied finding by the court that on June 30, 1966, there existed the first of the facts necessary to apply the trust fund doctrine —the insolvency of Cooper.

Cooper did not abruptly cease doing business on June 30, 1966. In fact it continued to operate on a substantial scale for sometime thereafter. In the year ending June 30, 1966, its gross receipts were about seven and a half million dollars. The approximate figures for subsequent years were: 1967—six and a half million, 1968 —two and a half million, 1969—two million, 1970—one million, and 1971—one half million. Thereafter it did no business. In

three of those years the company's books showed a small net profit before taxes. In the other three years substantial losses were shown. The total for the six year period was a loss of more than two hundred thousand dollars.

There is other significant evidence that characterizes the manner in which the management of Cooper conducted its business after it became insolvent on or before June 30, 1966.

On July 4, 1966, Cooper assigned all of its accounts receivable, present and future, to Albert and Don Fagan. All subsequent invoices to customers bore a notification of such assignment.

On July 12, 1966, Cooper reduced the bank account that was maintained in its name to a nominal amount and opened a concealed account in the name of "Robert W. Pate, Trustee." Thereafter Cooper manipulated its commercial transactions through use of the Pate account.

When the subterfuge of the Pate account was discovered by La Gloria's attorneys, another procedure was used to prevent La Gloria from reaching any funds Cooper had on deposit. Cooper, when it received collections from its customers, would hold them until checks which Cooper had written to its creditors were presented to the bank for payment. Thereupon Cooper would deposit its collections. If the deposits were more than enough to pay the checks drawn on its account and presented for payment, Cooper would buy cashier's checks to the extent of the excess.

For some years in the past Albert E. Fagan had had a contract with Cooper under the terms of which he was entitled to an annual bonus of 35% of Cooper's net profit before taxes. On September 12, 1966, Cooper's board of directors passed a resolution giving Don Fagan, Gerald Arnold and James Clark each an annual bonus of 15% of the net profits before taxes. The four officers, directors and shareholders thereupon paid themselves more than $100,000 in purported bonuses. Cooper's records show that it sustained a loss during the year ending June 30, 1967.

The false character of the so-called bonus payments that the officers made to themselves is evidenced by a notation on a work sheet upon which the company accountant computed the bonuses payable for the year ending June 30, 1968. As a note to his computation of a $3,000 bonus for Albert E. Fagan, the accountant wrote:

"Per terms of employment contract, literally A. E. Fagan would not receive a bonus, because there was a net loss before taxes; however, according to Don Fagan, this provision has been waived in the past and bonuses have been given (example 1966".

The June 30, 1966 balance sheet showed as a liability notes payable to stockholders in the amount of $67,000. The balance sheet of June 30, 1971, shows that that liability had been reduced to zero.

The Fagan family owned and controlled another corporation, Oil Chemical Marketing, Inc. (O.C.M.) which was engaged in substantially the same business as Cooper. The evidence sustains the conclusion that during the period of Cooper's decline its business was funneled into O.C.M. Some of Cooper's filling station properties and other properties were acquired by O.C.M. On December 31, 1970, Cooper's gasoline tax bond, guaranteed by Albert E. Fagan, expired. Thereafter a gasoline tax bond for O.C.M. was acquired on the basis of Albert E. Fagan's guarantee.

During the period following June 30, 1966, substantially all of the physical assets of Cooper were acquired by members of the Fagan family or by O.C.M. Even the office furniture and fixtures were bought by Don Fagan. The debts owed by Cooper to outside creditors and on which members of the Fagan family were guarantors were paid. At the time of the trial Albert E. Fagan testified that there were no unpaid

creditors except for some possible minor ones whom he could not identify and whose combined claims totaled less than $1,500. Albert E. Fagan did, however, contend that he had a valid claim as the owner of the judgment which the trustee in bankruptcy had got against Cooper.

 Under the evidence in this record the trial judge was justified in believing that in July 1966 those in control of Cooper conceived and instituted a scheme whereby they would so manipulate Cooper's affairs that it would continue business solely for the purpose of permitting it to pay the claims which they had against it and to pay the claims of creditors to whom they were secondarily liable. It was part of their scheme so conceived and instituted that they would strip the corporation of any surplus funds that it would otherwise have had with which to pay its creditor, La Gloria, by paying to themselves spurious bonuses. Their scheme also included an intention to acquire for themselves, for other members of their family and for O.C.M., which they controlled, all of the physical assets which Cooper owned and to transfer to O.C.M. Cooper's business operations. The evidence shows that their scheme so conceived and instituted was fully carried out so that on December 31, 1970, Cooper was an empty shell and La Gloria was unpaid. That was not the "good faith" continuation of Cooper's corporate business which would, under the rule set forth in the Lyons-Thomas Hardware Co. case, supra, prevent the applicability of the trust fund doctrine. On the contrary, we hold that the evidence sustains the implied finding by the trial court that as of June 30, 1966, Cooper was not only insolvent, but also ceased doing business in good faith and its management had no expectation that it ever again would resume such good faith operation. On that date, or soon thereafter, Cooper's managers began a nonstatutory process of dissolving their corporation, which process was followed to substantial completion. The evidence sustains the trial court's implied finding that La Gloria did not receive its equitable share of the assets of Cooper that were misapplied by the defendants. The appellants have not presented a point of error to the effect that the court's judgment is excessive in amount. The trial court's judgment against the defendants as officers and directors of Cooper is sustainable under the theory of the trust fund doctrine.

 We have not ignored the fact that Albert E. Fagan contended that he, too, was a creditor of Cooper by virtue of his purchase of the judgment from the trustee in bankruptcy. We have, however, considered that fact immaterial since the appellants have not preserved any point to the effect that the trial court's judgment is excessive in that it awards La Gloria a recovery that is more than it would have received if Cooper's assets had been ratably and properly distributed among its valid creditors.

 Furthermore, when Albert E. Fagan paid the trustee the $100,000, he apportioned the payment so as to fully pay the $59,000 judgment against him, personally, in order to get a valid release from it. He, therefore, paid something less than $41,000 for the assignment to him of the judgment against Cooper which then, with accumulated interest and costs, amounted to more than $138,000. He has already recovered from Cooper more than he paid for the judgment by levying execution on filling stations having a value, according to the testimony, of from $64,000 to $94,000. At the time he bought the judgment, in December 1967, the nonstatutory program to dissolve Cooper had been instituted and substantially accomplished. Cooper's ultimate total dissolution was imminent. Under the circumstances Albert E. Fagan's claim, if any, against the assets of Cooper for any amount in excess of the amount that he had paid for the judgment, which latter amount he had already recovered, could have been adjudged by the trial court to be subordinate to La Gloria's claim. See Taylor v. Standard Gas & Electric

Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L. Ed. 669 (1939). 3 W. Fletcher, Private Corporations, sec. 869.1 (1965).

■ Aside from the trust fund doctrine there is another theory of law that sustains the trial court's judgment. The evidence sustains an implied finding that the defendants appropriated to themselves the assets of Cooper and thereby "denuded" it so that it had nothing left with which to pay La Gloria. To the extent that they, as shareholders of Cooper, took to themselves the corporate assets, they are personally liable on La Gloria's claim. World Broadcasting System, Inc. v. Bass, 160 Tex. 261, 328 S.W.2d 863 (1959); Burton Mill & Cabinet Works, Inc. v. Truemper, 422 S. W.2d 825 (Tex.Civ.App.—Waco 1967, writ ref'd n. r. e.). Again we note that appellants have not challenged the amount of the trial court's judgment by contending that it exceeds the value of corporate assets taken by them.

The third theory proposed by the appellee as a basis for support of the trial court's judgment, that based upon the alter ego concept, is not applicable to the facts of this case. That theory is a nebulous one and is often misapplied or loosely applied by the courts. In some cases courts have applied it in fact situations similar to that wherein the Texas Supreme Court in the Lyons-Thomas Hardware Co. case, supra, applied the trust fund theory as a basis for holding officers and directors liable. In other cases the courts have applied it in fact situations similar to that wherein the Texas Supreme Court in the World Broadcasting case, supra, held shareholders personally liable because they had "denuded" the corporation by taking to themselves all of its assets. The U. S. Supreme Court in Taylor v. Standard Gas & Electric Co., supra, at 306 U.S. 322, at 59 S.Ct. 550, said of the rule, which it there called the "instrumentality rule",

"It is not, properly speaking, a rule, but a convenient way of designating the application, in particular circumstances, of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice."

■ There are some situations wherein the rule based upon the alter ego concept can be applied, with some degree of reason, to hold shareholders liable to creditors of their corporation. Those are situations wherein the corporation is not maintained as a bona fide entity, separate and distinct from its shareholders in the conduct of its own business, but rather is used as an agent or servant of the shareholders in the furtherance of their personal business. In such a situation where the corporation purportedly enters into a contract, but in doing so is in reality acting as agent for the shareholders in the furtherance of their personal business, the shareholders become liable on the contract, or for its breach, under the law of principal and agent. Where such a corporation commits a tort while carrying on the personal business of the shareholders, the latter become liable under the rule of respondeat superior. To impose such liability upon the shareholders it must be shown that they used it as a sham to accomplish a fraudulent, illegal or unfair purpose. Bell Oil & Gas Co. v. Allied Chemical Corp., 431 S.W.2d 336 (Tex.Sup.1968). Such theory of liability is not applicable to the facts of this case. La Gloria's claim against Cooper is based upon a guaranty contract made in 1964. There is no showing that in the making of such contract at such time Cooper was anything other than a bona fide corporation acting in the furtherance of its own separate and legitimate business. It was not, in making such contract, acting as the agent (alter ego) of its shareholders.

■ The final question to be disposed of by this appeal relates to the appellants' contention that James Clark should not be jointly liable for the entire amount awarded La Gloria. Clark left Cooper in October of 1968. Appellants

argue that the facts giving application to the trust fund theory did not occur until 1971, so that Clark never became a fiduciary. That argument does not prevail because the trust was fixed as of the end of Cooper's fiscal year on June 30, 1966. Clark became a fiduciary of La Gloria at that time. He jointly participated in the institution and accomplishment of the program by which La Gloria was inequitably deprived of its pro rata share of Cooper's assets on Cooper's dissolution. La Gloria's measure of recovery against the officers and directors of Cooper, who became La Gloria's trustees, is the difference between what it got of such assets (nothing) and what it would have got on equitable distribution. No contention is made here that the judgment rendered is for an amount in excess of such measure. There is no evidence that Clark ever renounced the breach of trust or ever took any action to prevent the fraudulent program thereby set in operation from running its full course. As a joint participant in it, he is jointly and severally liable for La Gloria's entire loss.

█ Under the theory of liability recognized in the World Broadcasting case, supra, the extent of the liability of the shareholders who have denuded a corporation is the value of the assets that they have wrongfully taken. Those shareholders who jointly participated in the wrongful taking of corporate assets each became jointly and severally liable to the corporate creditors for the entire value of the assets so taken by all shareholders, up to an amount sufficient to satisfy the claims against the corporation. There is no contention made here that the evidence does not support an implied finding that the total value of Cooper's assets wrongfully taken by these defendants does not equal or exceed the amount of La Gloria's judgment. Clark, as a joint participant in that wrong, is jointly and severally liable for the entire judgment.

The judgment of the trial court is affirmed.